JOHN ALLEN v. ELIZABETH M. JOHNSON et al.

1. MARRIED WOMEN—EMPLOYMENT OF AGENT OR OVERSEER.—Notwithstanding slavery is abolished, the act of 1857 is still applicable to contracts made by married women for the employment of an agent to overlook the tenantry and gather in her portion of the product or money rent; and satisfaction may still be had out of the separate estate of such married women.

2. SAME—THEIR CONTRACTS.—Though married women may not, as a general proposition, have capacity to form partnerships, nor be responsible as such, they may, nevertheless, when joint tenants of real estate, lease the land or cultivate it together, and divide the products. And if, in such case, they employ an agent to manage the business, they will be held responsible for his wages.

APPEAL from the chancery court of Washington county. HARMON, Chancellor.

The argument of counsel and the opinion of the court contain a sufficient statement of the case.

*Nugent & Yerger*, for appellant.

I. The objection of a want of jurisdiction is urged for the reason that, under our statutes, courts of law are competent to grant relief in favor of the appellant against the separate estate of the appellees. The objection is not well taken. Their cognizance may be, and doubtless is, concurrent, but not exclusive. Prior to the adoption of our statutes the courts of chancery had exclusive jurisdiction in cases involving the separate estates of married woman, and it is a cardinal maxim in those courts that jurisdiction once acquired is never surrendered. The act of 1857 does not negative this jurisdiction, and it, of necessity, continues. Cord on Rights of Married Women, §§ 265, 270; 1

Story Eq. Jur., §§ 64 *i*, 64 *k*, 65, 66, 71; 2 ib. § 1368; McKenzie v. Johnston, 4 Madd. 373.

II. But is contended that the contract relied upon in this case was not authorized by law, and the liability incurred is not chargeable upon the estates of the appellees. The language of the statute is: "All contracts made by the husband and wife, or by either of them, * * * for the maintenance, care and support of her slaves, and .for the employment of an agent or overseer for their management, may be enforced, and satisfaction had out of her separate estate. And all contracts made by the wife, or by the husband with her consent, * * * for work and labor done for the use, benefit or improvement of her separate estate, shall be binding on her, and satisfaction may be had out of her separate property." This language was evidently employed in reference to a state of things which has, in part, ceased to exist, and, it is urged, cannot be made applicable to married women or their separate estate at the present time. That slavery being abolished, the wife has no right to employ, nor has her husband for her, an agent for the management of hired laborers or tenants upon her plantation.

1. There is no doubt that married women are entitled to the beneficial enjoyment of such property and its profits, products and income. This granted, it seems to us that they are necessarily authorized to employ an agent to assist in the creation, so to speak, of the "product" from their separate estates by the management of the laborers or tenants upon them. Beyond doubt, she has the power to lease her property, and to all the rights and privileges requisite to the proper enjoyment of that power. The modes of leasing property are as various as the dispositions of the parties owning it. The law simply gives the wife the power to rent without prescribing the manner in which she may execute that power, the quantity or character of the

rent to be reserved, or the agency by which it is to be realized or collected. Suppose, as is usual in the county in which the property of the parties is situate, the appellees had leased to laborers for one-half the gross crops to be raised by them, under certain conditions, or for one-fourth the "product" of the laborers, reserving the privilege of supervision, management and direction, so as to make the "product" more than it would be if the laborers were left to themselves; and in pursuance of this reservation they had employed an agent or experienced planter to supervise and direct the laboring tenants, will it be said this contract is not authorized by law? Here was a means employed, indispensable to the end necessary to secure the "product" to which the appellees were entitled.

The authority to employ an agent for the purposes mentioned in the bill, necessarily grows out of the right to enjoy the rights, issues, profits, products and income of their separate estate.

2. The operation of the ordinance of the convention abolishing slavery is not such as to defeat the complainant's right to a recovery. Construed *in pari materia* with the act of 1857, it would simply have the legal effect to strike from the act the word "slaves," and substitute in its place the persons formerly occupying that relation, but whose condition, as to servitude, was only changed from compulsory to voluntary.

3. Aside from this, the appellees had the power to contract for work and labor for "the use, benefit or improvement" of their separate estate. These words are general in terms. No particular kind of work and labor is specified. The contract, as set out in the bill, was one entered into expressly for "such use and benefit." The supervision of an educated intelligence is a necessity to prevent waste and deterioration in fertility, and increase the product of the sail. To deny to a married woman the privilege of employing such intelligence, is

to say she may have the product of the soil, but cannot use the means necessary to create or enhance the product; an absurdity too glaring to require confutation.

*F. & L. B. Valliant,* for appellees.

The ground of demurrer that we principally insist upon is, that the contract sued on is not such an one as a married woman could make chargeable on her separate estate. The services by the complainant were rendered and the contract therefor made, according to the bill, in 1870; hence the Code of 1857 is the law that governs the contract.

Assuming, upon the authority of all the cases in the Mississippi Reports, among which we would cite Robinson v. Bruner, 24 Miss. 242; Robinson v. Ward, 12 S. & M. 490; Hardin v. Phelan, 41 Miss. 112; Stevenson v. Osborn, ib. 119; Whitworth v. Carter, 43 ib. 61; Dunbar v. Mayer, ib. 679; Foxworth v. McGee, 44 ib. 340; Bank of Louisiana v. Williams, 46 ib. 430; that the contract of a married woman is void unless it comes within the positive and literal exceptions of the statute, we conclude that the contract sued on is not binding on the two married ladies, because, first, it arises out of a co-partnership contract, which is not within the statutory exception; and, second, the services contracted for do not bring it within either of the exceptions. The statute which authorizes a married woman to make a contract that will be binding on her separate estate, for family or plantation supplies, does not authorize her, under the guise of a co-partnership contract, to pay for family or plantation supplies purchased in whole or in part, for another woman; nor does it authorize one married woman, under the form of a co-partnership, to make a contract which will subject her property to pay for overseer's wages furnished in whole or in part to another woman.

Letting down the bars, to permit a married woman to enter into the field of co-partnership contracts, gives her a license by which she may escape the guardian eye of the law. In Foxworth v. Magee, 44 Miss. 430, it was held that a married woman could not become a member of a commercial firm. And although a distinction is drawn between commercial partnerships and planting partnerships (Davis v. Richardson & May), yet the distinction is not such as would affect the doctrine announced in Foxworth v. Magee. If she could become a member of a planting concern composed of herself and one other, she might become a member of a concern composed of a dozen, and thus be made responsible for plantation supplies or overseer's wages to large amounts in which she really had very little interest.

The second point we would present is, that a married woman could not make a contract in 1870 for overseer's wages to manage laborers employed. Contracts made "for the maintenance, clothing, care and support of her slaves, and for the employment of an agent or overseer for their management, may be enforced and satisfaction had out of her separate estate." Rev. Code 1857, p. 336, art. 25. This is for overseer's wages to manage her slaves, not her hired laborers. The corresponding section 1780, in Code of 1871, omits overseer's wages entirely. If the last part of the above sentence, quoted from Code of 1857, is to be construed as applicable to hired laborers, the first part of the same sentence must also have a like interpretation, and so a contract made "for the maintenance, clothing and support" of one in the employ of the married woman will also be binding on her. And this again opens up an almost unlimited range of contracts for the married women to embark in.

SIMRALL, J.:

The question raised by the demurrer and argued by counsel is, whether a married woman is responsible for

work and labor, and services of an agent or overseer who manages and superintends her plantation. We shall consider the question in the general; without reference so much to the special facts set up in the bill, as that, perhaps, needs amendment. This contract originated under the statute of 1857. The 25th article of the married woman's law (Code, p. 336), so far as this particular question is concerned, had especial reference to the then state of society, and the character of labor used in the cultivation of the plantation. Express authority is there given to husband and wife, or either of them, "for the employment of an agent or overseer." But, it is said, since slavery has ceased to exist, the power to make such a contract has ceased also. That would be giving an exceedingly narrow interpretation to the statute. The entire article manifests quite clearly a purpose to put the plantation under the control of the wife, as also its income. She has the election either to cultivate on her own account, or to rent out. The first clause confers upon her full right to lease. The second clause contemplates a case of cultivation by herself and for her account, and makes her responsible for supplies for the plantation, and for the maintenance and support of her slaves, and for an agent or overseer for their management. Although she cannot now own slaves, she may, if she chooses, cultivate her lands, and be responsible for supplies therefor. If she may do that, necessarily she must employ the usual and necessary means to make the cultivation effectual and profitable. If she may purchase work animals, implements of husbandry, machinery for preparing the product for market, she must have also the right to employ an agent to supervise the whole. We must give a general statute like this, such a reading as will adapt it to the changed circumstances of the agricultural interest. When the law of 1857 was passed, to a very large extent the

plantations of married women were cultivated by their slaves. If they were leased, they were generally rented in a body. Now, if she cultivates on her own account, she must do so with free labor, and upon such terms of compensation as are usual and customary. She may give the use of the land, animals and farming tools for part of the crop in kind, or for rent in money. She may parcel out her lands to several tenants, and is as free as any other land owner, as to the terms of leasing or of raising crops on agreed terms of dividing the product.

It may be necessary now, as under the *regime* which has passed away, to employ an agent to attend to farming and landed interests. We can find enough in the general purpose and intent of the 24th and 25th articles of the Code to uphold such contracts. " The rents, issues, profits, products and income, of either real or personal estate, inure to the sole and separate use of the wife." First clause of 24th art. Subsequent provisions indicate that the " products" of lands may come to her by cultivation, or the "rents" may inure from leasing. The intent is, that she may derive income and product, in either mode, and if an agent be employed to overlook the tenantry and gather in her portion of the product or rent money, such an agency is incidental to a profitable use of the principal power.

The complainant alleges that he was employed to manage the laborers upon and to supervise and direct the cultivation of the plantations, which jointly belong to the defendants, Mrs. Johnson and Mrs. Shelly, and that he rendered the service. Counsel for the appellees make the argument that married women cannot enter into partnership. That may be, and is true, as a general proposition. They may, however, when joint tenants of real estate, lease the land, or cultivate together, and divide the product. If, for the orderly conduct of the business, they arrange for its manage-

ment by a particular person or persons, that does not constitute a partnership in the ordinary commercial sense, nor would they be responsible as such.    Their relations are those of joint tenants, sharing in the possession and burdens and profits of the joint property. As to the bill of exchange given to complainant on Hoy & Co., which was not paid, in that feature it is very much like the case of Matheny v. Clopton, decided at this term.

We think there is equity in the bill.    If the defendants ought not to pay this debt, they may make the defense in an answer.

The decree of the chancery court, sustaining the demurrer and dismissing the bill, is reversed, judgment here overruling the demurrer, and cause remanded for answer in forty days from this date.